UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

MATTHEW SMYER,

       Plaintiff,

vs.

KROGER LIMITED
PARTNERSHIP I, *et al.*,

       Defendants.

Case No. 3:20-cv-114

District Judge Michael J. Newman

---

**ORDER: (1) GRANTING KROGER'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 57); (2) DENYING SMYER'S MOTION FOR LEAVE TO FILE A REVISED MEMORANDUM IN OPPOSITION (DOC. NO. 70); (3) DENYING SMYER'S CROSS MOTION FOR SUMMARY JUDGMENT (DOC. NO. 58); (4) DISMISSING WITH PREJUDICE SMYER'S CLAIMS 1-2 AND 7-12; (5) DISMISSING WITHOUT PREJUDICE SMYER'S CLAIMS 3-6 AND 13; AND (6) TERMINATING THIS CASE ON THE DOCKET**

---

       This case is before the Court on the parties' cross motions for summary judgment. Doc. Nos. 57, 58. Defendants Kroger Limited Partnership I, Eric Curtis, Jessica Utterback, Pam Hargis, and Duane Hatfield (collectively, "Kroger") move for summary judgment against Plaintiff Matthew Smyer's complaint. Doc. No. 57.[1] Smyer seeks partial summary judgment on his Count 9, reverse race discrimination under Title VII, 42 U.S.C. § 2000e-2(a). Doc. No. 58.

---

[1] Smyer's complaint consists of thirteen counts either against Kroger or individual Kroger employees alleging: (1) Family and Medical Leave Act ("FMLA") interference, 29 U.S.C. § 2615(a)(1); (2) FMLA retaliation, 29 U.S.C. § 2615(a)(2); (3) assault; (4) negligent supervision; (5) intentional infliction of emotional distress; (6) fraud and misrepresentation; (7) disability discrimination, Ohio Rev. Code § 4112.02(A); (8) reverse sex discrimination; (9) reverse race discrimination; (10) aiding and abetting discrimination, Ohio Rev. Code § 4112.02(J); (11) wrongful discharge in violation of public policy; (12) wrongful discharge based on breach of an implied contract; and (13) wrongful discharge based on promissory estoppel.

Smyer also moves for leave of Court to file what he describes as a "revised memorandum in opposition" to Kroger's summary judgment motion.  Doc. No. 72.  Smyer filed this document twelve days after filing his original memorandum in opposition to Kroger's summary judgment motion and seven days after Kroger filed a reply brief in support of its summary judgment motion.  Doc. Nos. 64, 67, 72.  Kroger says Smyer's "revised memorandum in opposition" is really an improper sur-reply and asks the Court to disregard it.  Doc. No. 74.

The Court will address each motion in turn.

## I.

Smyer, a Caucasian male, is the former manager of three different Kroger stores in the Dayton area.  Doc. No. 15 at PageID 578, 593; Doc. No. 15-1 at PageID 677.  Although he described store management as his "dream" job, his last two managerial stints ended with some form of discipline.  Doc. No. 13 at PageID 229–30; Doc. No. 15 at PageID 578, 593; Doc. No. 15-1 at PageID 677.  Kroger terminated him in March 2020 for what it describes as insubordinate behavior and failure to meet performance standards.  Doc. No. 13 at PageID 229–30; Doc. No. 15 at PageID 578, 593; Doc. No. 15-1 at PageID 728–32.  Smyer sued Kroger and several of his former supervisors because he believes he was terminated in violation of the FMLA, 29 U.S.C. § 2615, and Ohio anti-discrimination laws, Ohio Rev. Code § 4112.02, and that he was the victim of several intentional torts and fraud.  Doc. No. 1 at PageID 101–15.  There is no dispute over the following circumstances of Smyer's termination (save for one caveat).

In May 2017, Smyer's supervisor, District Manager Clint Rose, met with him to discuss his performance as manager of the Wilmington store.  Doc. No. 15 at PageID 578; Doc. No. 15-1 at PageID 677.  Rose explained to Smyer that several Wilmington store associates had voiced "their concerns regarding [Smyer's] leadership."  Doc. No. 15-1 at PageID 677.  Smyer's term as Wilmington store manager had "started off on the wrong foot," and, in Rose's view, Smyer had

not shown "sign[s] of improvement." *Id.* Rose wanted to give Smyer a second chance, and he informed Smyer that he would be transferred to the smaller Bechtle Avenue store. *Id.* Rose made Smyer's performance expectations clear: "build[]" on the existing team atmosphere at Bechtle Avenue, ensure the store is "up and ready" and "at least at 85%" by 9:00 a.m. each morning, and establish effective communication with his assistant managers. *Id.*

According to his supervisors, Smyer did not fare much better at Bechtle Avenue. Doc. No. 13 at PageID 229–30, 236 Doc. No. 15-1 at PageID 693. In August 2019, Division Human Resources Leader Duane Hatfield called Human Resources Manager Andrea Cook after visiting Bechtle Avenue. Doc. No. 15-1 at PageID 693. Hatfield found the meat department to be an "abomination," and Cook, upon visiting the store, discovered the meat and deli case was in disarray. *Id.* Cook learned that Smyer's meat department schedule left the department understaffed in the mornings. *Id.* The assistant meat department manager told Cook that when he voiced his staffing concerns to Smyer, Smyer apparently laughed at him. *Id.* at PageID 694. Cook's investigation came on the heels of complaints from other Bechtle Avenue employees questioning Smyer's interpersonal skills coupled with threats to resign if his leadership did not improve. *Id.* at PageID 694–95.

Smyer did not know it at the time, but he and other store managers were being evaluated for layoffs. *Id.* at PageID 698. Rose met with Smyer on October 2, 2019, to explain how close he was to being let go. *Id.* Smyer was "lucky to be keeping his job," Rose warned, despite his "poor store conditions and poor treatment of his associates." *Id.* Rose advised that Smyer improve his performance by following Kroger's best store manager practices guide. *Id.*

About two weeks later, a chicken fryer caught fire in the Bechtle Avenue store. Doc. No. 15-1 at PageID 699; Doc. No. 63 at PageID 1930. Smyer's assistant manager called him at home

to tell him that the store had been evacuated.  Doc. No. 15-1 at PageID 699.  Smyer attempted to call Eric Curtis—who recently replaced Rose as Smyer's direct supervisor—to tell him what happened.  *Id.*  Curtis did not answer right away and instead texted Smyer, "Have you called the fire department?  If not, don't."  Doc. No. 15-1 at PageID 699; Doc. No. 63 at PageID 1930.  The fire department had already arrived and determined the store's sprinkler system put out the fire. Doc. No. 15-1 at PageID 699.

Curtis and Associate and Customer Experience Coordinator Jessica Utterback met Smyer several days later to discuss the fire incident.  Doc. No. 63 at PageID 1938–39.  Smyer explained he did not arrive at the store immediately because he had to finish mowing his lawn and then pick up his stepdaughter—who suffers from a chronic condition that prevents her from driving—at a local college.  Doc. No. 15-1 at PageID 699; Doc. No. 63 at PageID 1939.  Curtis told Smyer that he should have dropped what he was doing and returned to the store.  Doc. No. 15-1 at PageID 699; Doc. No. 63 at PageID 1939.

Smyer addressed the fire and his recent performance issues with Hatfield and Utterback on October 25, 2019.  Doc. No. 15-1 at PageID 699.  Hatfield questioned why Smyer did not go to his store immediately upon hearing about the fire.  *Id.* at PageID 700–02.  Smyer gave the same reasoning he provided to Curtis.  *Id.*  Hatfield felt that Smyer did not understand the "seriousness of [his supervisors'] concerns" and decided that Smyer would be reassigned to the smaller South Limestone store and receive a salary reduction.  *Id.* at PageID 703, 704, 721.  Smyer acknowledged in a disciplinary memorandum that this was his "last chance and final warning," and further violations of Kroger policy could result in his termination.  *Id.* at PageID 721.

Kroger decided to close the South Limestone store in January 2020.  Doc. No. 15 at PageID 597.  Smyer was responsible for certain shutdown tasks like establishing clearance and markdown

sections. *Id.*; Doc. No. 15-1 at PageID 722–23. Curtis checked in on Smyer's progress in February 2020 and was not pleased. Doc. No. 15 at PageID 598; Doc. No. 15-1 at PageID 722–25. Smyer had neither completed his assigned tasks nor communicated shutdown duties to his assistant managers. *Id.* at PageID 722–25. Curtis issued Smyer a disciplinary memorandum, again warning that further infractions could result in discharge. *Id.*

Smyer saw things differently. *Id.* He explained to Curtis that Audit Manager Merle Hargis—a corporate employee responsible for overseeing store closings—recently visited South Limestone and praised Smyer's progress. *Id.* Smyer said that Hargis told him that "[store staff] were way beyond expectations" and that "he was very pleased with our performance." *Id.* When Curtis forwarded Smyer's comments to Hargis, Hargis replied "this is not a true statement." *Id.* at PageID 725. Rather, Hargis explained, Smyer and his staff were far behind on their shutdown assignments. *Id.*

Utterback attempted to raise several other issues with Smyer over the next few weeks, but Smyer did not return her messages or phone calls. *Id.* at PageID 728. Utterback learned that Smyer failed to timely post an employee vacation schedule and, despite her instructions, did not complete a review of his assistant store manager. *Id.* The next time Utterback visited South Limestone, she found the fresh departments' shelves—produce, meat, deli, bakery—barren. *Id.* at PageID 731.

By March 4, 2020, Curtis and Utterback were convinced that Smyer should be terminated. They brought their recommendation to Hatfield, who agreed with the decision. *Id.* at PageID 732. Hatfield allowed Curtis and Utterback to present Smyer with a voluntary resignation option. *Id.* Hatfield planned to fire him if he did not resign. *Id.*

Curtis and Utterback met with Smyer in the South Limestone manager's office later that day. *Id.* at PageID 733. Curtis asked why Smyer's assistant manager's performance review was delayed and asked him to explain why the store closing tasks were not timely completed. *Id.* Smyer pushed back, insisting that he had completed his assignments and that Hargis was satisfied with his progress. *Id.* The parties have different accounts of what happened next. According to Utterback's notes, which she took during the meeting, Smyer asked Curtis to stop raising his voice at him, to which Curtis replied, "I'm not. Just go. Leave your keys." *Id.* at PageID 739. As Curtis stood up to walk Smyer out of the room, Smyer said, "Your['re] frightening me. I'm scared!" *Id.* Curtis sat back down, saying "I'm not. Give me your keys. If you're frightened, you should leave." *Id.* Smyer replied that, "We are having a conversation," and after several moments of silence, Utterback proposed that they "reconvene tomorrow." *Id.*

Smyer remembers the meeting differently. In his complaint, Smyer alleges that Curtis "abruptly announced" he was giving Smyer a 2 on his performance review for friendliness. Doc. No. 1 at PageID 99. When Smyer asked why, Curtis stood up, "got in Smyer's face, and pointed his finger at him repeatedly yelling 'no more questions.'" *Id.* Smyer recalled that Curtis "kept yelling" at him though he was "recoiling in fear." *Id.* During his deposition, Smyer recalled the interaction differently. Doc. No. 15 at PageID 608–09. Smyer testified that Curtis "jumped out of his seat and cocked his arm back to punch me. I then braced myself . . . covering my head[] because I thought I was going to get hit." *Id.*

The parties' do not dispute that Smyer met with Hatfield two days later. Doc. No. 15-1 at PageID 755. Initially, Curtis and Utterback were in the meeting. *Id.* But, when Smyer expressed discomfort around Curtis, Hatfield excused both Curtis and Utterback. *Id.* at PageID 757. Hatfield and Smyer then met with an HR representative. *Id.* at PageID 762. When Hatfield communicated

his concerns about Smyer's store closing performance, Smyer insisted that "we had a good close." *Id.* at PageID 768. But, to Hatfield, this contradicted everything Smyer's supervisors reported and led Hatfield to believe that Smyer would not take accountability for his performance issues. *Id.* Hatfield adjourned the meeting without taking any action. *Id.* at PageID 770.

Smyer and Hatfield met again on March 11, 2020. Doc. No. 13 at PageID 261. It was then Hatfield delivered the news: Smyer was terminated, effective immediately. *Id.* at PageID 261, 271; Doc. No. 15 at PageID 612. Hatfield offered him a two-month severance package. Doc. No. 13 at PageID 261. Smyer rejected it and, instead, filed a complaint in this Court. Doc. No. 1 at PageID 101.

## II.

The Court first addresses Smyer's motion for leave to file his "revised memorandum in opposition" to Kroger's summary judgment motion. Doc. No. 70 at PageID 2104. Kroger characterizes this filing as a sur-reply because, on its reading, the brief raises new arguments based on newly produced evidence. Doc. No. 74 at PageID 2274. Smyer says his "revised memorandum in opposition" merely adds citations missing from his first opposition memorandum and replaces former Kroger employee Patricia Emmendorfer's signed affidavit with her previously submitted, but unsigned, affidavit. Doc. No. 70 at PageID 2105. But a comparison between the two briefs and their attachments reveals the "revised memorandum in opposition" does far more than Smyer lets on. *Compare* Doc. No. 64, *with* Doc. No. 70-1.

Start with the differences between Smyer's original and revised opposition memoranda. Doc. Nos. 64, 70-1. Smyer's original opposition memorandum runs 30 pages from Introduction to Conclusion. Doc. No. 64. His revised opposition memorandum spans 32 pages. Doc. No. 70-1. Beyond the differences in length, the revised opposition memorandum differs significantly in substance. Some of these changes were found in the revised opposition memorandum's table of

7

contents, which contains chunks of argument summary absent from the original filing, but, on the whole, these differences consist of substantive alterations to Smyer's original opposition memorandum repackaged as a revised opposition memorandum. Doc. Nos. 64, 70-1. In short, the "revised" opposition memorandum smacks of an additional filing beyond his one allotted opposition memorandum.

Local Civil Rule 7.2(a)(2) requires a party to demonstrate "good cause" to file "additional memoranda" beyond the regular supporting, opposition, or reply memoranda. S.D. Ohio Civ. R. 7.2(a). Smyer's good cause? (1) Kroger's reply memorandum points out that Smyer's original opposition memorandum contains sparse citation to the record; and (2) he was unable to obtain Emmendorfer's signature by his opposition memorandum filing deadline. Doc. No. 70 at PageID 2105. But these reasons only scratch the surface of the substantive revisions made to his revised opposition memorandum. Doc. No. 70-1. Nor does he contend with the fact that he attempts to file a revised opposition memorandum *after* Kroger filed its reply brief.

There is a vehicle by which to respond to new arguments raised in a reply brief: the sur-reply. Generally, "good cause" exists to file a sur-reply brief "where the reply brief raises new grounds that were not included in movant's initial motion." *NCMIC Ins. Co. v. Smith*, 375 F. Supp. 3d 831, 835 (S.D. Ohio 2019) (quoting *Comtide Holdings, LLC v. Booth Creek Mgmt. Corp.*, No. 2:07-cv-1190, 2010 WL 4117552, at *4 (S.D. Ohio Oct. 19, 2010)). Or, good cause might be the need to "'clarify misstatements' contained in the reply brief." *Id.* (quoting *Guyton v. Exact Software N. Am.*, 2:14-cv-502, 2015 WL 9268447, at *4 (S.D. Ohio Dec. 21, 2015)). Smyer's revised opposition memorandum does not make either of these points. Doc. No. 70-1. Instead, Smyer's motion for leave launches into a discussion of the persuasive value of the testimony Kroger cites in support of its summary judgment motion. *See, e.g.*, Doc. No. 70 at PageID 2108–

09 (rejecting Kroger's characterization of deposition testimony and arguing that Kroger asks the Court to make a "credibility resolution" as grounds to file a revised opposition memorandum). His explanation—that a revised opposition memorandum is necessary to supply missing citations to the record—has more to do with deficiencies in his original opposition memorandum than any new ground that Kroger raises. *Id.* at PageID 2105.

There is another notable difference between the original and revised opposition memoranda: Smyer's affidavit attached to his revised, but not his original, opposition memorandum. Doc. No. 70-4. Smyer only attached Emmendorfer's and Clint Rose's affidavits to his original opposition memorandum. Doc. Nos. 64-1, 64-2. Smyer's affidavit attached to his revised opposition memorandum offers new, and potentially significant, evidence in response to Kroger's summary judgment motion. Doc. No. 70-4. In the affidavit, he claims that during the October 25, 2019 meeting following the chicken fryer fire, he told his supervisors, including Hatfield, "that I had approved intermittent FMLA leave to care for [my stepdaughter] and that before returning to the store I used my FMLA leave to first bring [my stepdaughter] home." Doc. No. 70-4 at PageID 2167. Kroger's main defense to Smyer's FMLA claim is that Hatfield, and Smyer's other supervisors, were unaware that Smyer requested, or used, FMLA leave. Doc. No. 57 at PageID 1620; Doc. No. 67 at PageID 2059. In a reply memorandum filed before Smyer's revised opposition memorandum, Kroger points out that Smyer's assertion—that he brought up FMLA leave during the October 25, 2019 meeting—was unsupported by citation to the record. Doc. No. 67 at PageID 2059. Smyer's affidavit attempts to throw that into dispute. Doc. No. 70-4 at PageID 2167.

To the extent that Smyer's affidavit is new evidence introduced outside his original opposition memorandum, there is also a Local Rule for that. Local Civil Rule 7.2(d) provides that

"[w]hen proof of facts not already of record is necessary to support or oppose a motion, all evidence then available shall be discussed in, and submitted no later than, the primary memorandum of the party relying upon such evidence." S.D. Ohio Civ. R. 7.2(d). This rule reflects a basic feature of summary judgment: it is the nonmovant's time to lay his or her evidentiary cards on the table. *See, e.g.*, *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) ("Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events" (quotation omitted)). Rule 56(e) permits the court to "consider [as] undisputed" a moving party's "assertion of fact" that goes unaddressed by the nonmoving party and "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2) and (3). Allowing for "revised" opposition memoranda that introduce new evidence would dilute Rule 56(e)'s requirement that a nonmoving party address assertions of fact or else face summary judgment. *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial'"). Plus, it would invite endless rounds of additional briefing where each party would request an opportunity to respond to newly produced evidence.

The Court has "broad discretion to manage its docket," *Am. Civil Liberties Union of Ky. v. McCreary Cnty.*, 607 F.3d 439, 451 (6th Cir. 2010) (citing *Reed v. Rhodes*, 179 F.3d 453, 471 (6th Cir. 1999)), and may exercise this authority to strike filings that violate our Local Rules, *see, e.g.*, *Newman v. Univ. of Dayton*, 3:17-cv-179, 2017 WL 4076517, at *3–5 (S.D. Ohio Sept. 14, 2017) (exercising docket management authority to strike an improperly filed opposition memorandum

10

and citing similar cases). Indeed, the Court has an obligation to demand litigation be conducted consistent with the applicable rules of procedure to "protect[ ] the due and orderly administration of justice." *Bowles v. City of Cleveland*, 129 F. App'x 239, 241 (6th Cir. 2005) (quoting *Cooke v. United States*, 267 U.S. 517, 539 (1925)).

Smyer's "revised" opposition memorandum runs afoul of the Local Rules and must be barred. S.D. Ohio Civ. R. 7.2(a)(2) and (d). Smyer's revised filing attempts to bolster his original opposition memorandum in response to Kroger's reply arguments. Doc. No. 70-1. Neither the Federal Rules of Civil Procedure nor this Court's Local Rules permit this type of filing, and the Court will not make such an exception. Smyer's motion for leave is thus **DENIED**, and the Court will disregard his revised opposition memorandum, and its attachments, while reviewing the parties' cross summary judgment motions.

The Court now turns to the merits.

### III.

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex*, 477 U.S. at 322; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex*, 477 U.S. at 323; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). The moving party must either point to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *See* Fed. R. Civ. P. 56(c)(1)(A) and (B). A court considering a motion for summary judgment must view

the facts and all inferences in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## IV.

Smyer brings both FMLA interference and retaliation claims.  Doc. No. 1 at PageID 101–03.  The FMLA authorizes covered employees to take up to twelve weeks of leave per year for certain health-related reasons, including "[i]n order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C).  An employee can demonstrate their employer violated their FMLA rights under two theories: (1) entitlement or interference; and (2) retaliation or discrimination.  *See Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007) (citing 29 U.S.C. §§ 2615(a)(1) and (2)). The "entitlement or interference" theory prohibits an employer from "interfer[ing] with or deny[ing] an employee's exercise of her FMLA rights, and . . . require[s] the employer to restore the employee to the same or an equivalent position upon the employee's return."  *Id.* (citing 29 U.S.C. §§ 2614(a)(1) and 2615(a)(1)) (quotations omitted).  "The 'retaliation' or 'discrimination' theory' prevents an employer from "discharging or discriminating against an employee for 'opposing any practice made unlawful by' the Act."  *Id.* (quoting *Arban v. West Publ'g Corp.*, 345 F.3d 390, 400–01 (6th Cir. 2003)).

Under either theory, Smyer must demonstrate his exercise of FMLA leave was a causal factor in Kroger's decision to terminate him.  *See Wallace v. FedEx Corp.*, 764 F.3d 571, 585 (6th Cir. 2014) ("Employees seeking relief under the [interference] theory must [also] establish that the employer's violation caused them harm" (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006))); *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014) (concluding temporal proximity between FMLA-leave request and firing demonstrated causation).  He elects to make his case with indirect evidence under the *McDonnell Douglas*

12

burden-shifting framework. *See Romans v. Mich. Dep't of Hum. Servs.*, 668 F.3d 826, 842 (6th Cir. 2012) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). This means Smyer must first demonstrate a *prima facie* case of FMLA interference or retaliation. *See, e.g.*, *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012) (applying *McDonnell Douglas* burden-shifting to both FMLA interference and retaliation claims). If successful, the burden of production shifts to Kroger to demonstrate a non-discriminatory reason for his termination. *See Mullendore v. City of Belding*, 872 F.3d 322, 327 (6th Cir. 2017). Smyer must then show that a rational jury could find Kroger's proffered reason is pretextual. *Demyanovich*, 747 F.3d at 427.

As explained below, Kroger is entitled to summary judgment on Smyer's FMLA claims. Smyer advances no evidence to show that those involved in his termination—Hatfield, Curtis, and Utterback—knew, or should have known, he requested, or was approved for, FMLA leave. Even if Smyer could advance past the *prima facie* stage, he cannot overcome the undisputed evidence that Hatfield fired him for his poor performance as store manager.

### A. *Prima Facie* Case

An FMLA-interference claim requires a plaintiff to show that: (1) he was a covered employee; (2) the defendant meets the FMLA's definition of "employer"; (3) he was entitled to FMLA leave; (4) "he gave the employer notice of his intention to take FMLA leave; and (5) his employer denied FMLA benefits to which he was entitled." *See Dyer v. Ventra Sandusky, LLC*, 934 F.3d 472, 475 (6th Cir. 2019). For a retaliation claim, a plaintiff must establish that: "(1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action." *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006). The parties dispute just one element of the respective

*prima facie* cases: whether those involved in Smyer's termination (Curtis, Hatfield, and Utterback) knew he had asserted his FMLA rights. Doc. No. 57 at PageID 1620; Doc. No. 64 at PageID 2024.

Core to both an FMLA-interference and retaliation claim is that the decisionmaker knew the employee requested, or was granted, FMLA leave before taking the adverse action. *See, e.g.*, *Walton v. Ford Motor Co.*, 424 F.3d 481, 486 (6th Cir. 2005) ("[T]o invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave" (alteration in original) (quoting *Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir. 1998))). A plaintiff could not prove their exercise of FMLA rights was a causal factor in the adverse employment action otherwise. *See Scott v. Eastman Chem. Co.*, 275 F. App'x 466, 482 (6th Cir. 2008) ("[O]ne cannot retaliate against an employee for engaging in protected activity unless he knew the employee had done so"). A reasonable jury must be able to find—whether through direct or circumstantial evidence—that the decisionmakers "knew or were aware" that the plaintiff was entitled to, and seeking, FMLA leave. *Mulhall v. Ashcroft*, 287 F.3d 543, 551 (6th Cir. 2002) (emphasis omitted).

There are no magic words an employee must use to assert their FMLA rights. *See, e.g.*, *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 725 (6th Cir. 2003) ("[A]n employee can give notice sufficient to make his employer aware that he needs FMLA-qualifying leave without using the words 'leave' or 'leave of absence'"), *abrogated on other grounds by* 29 C.F.R. § 825.302(d). Instead, "an employee gives his employer sufficient notice that he is requesting leave for an FMLA-qualifying condition when he gives the employer enough information for the employer to reasonably conclude that an event described in the FMLA § [2612(a)(1)] has occurred." *Wallace*, 764 F.3d at 586 (quoting *Cavin*, 346 F.3d at 723–24). "[W]hat is practicable, both in terms of the

timing of the notice and its content, will depend upon the facts and circumstances of each individual case." *Walton*, 424 F.3d at 486 (quoting *Cavin*, 346 F.3d at 724).

Smyer points to three instances where he believes his supervisors should have known he was asserting his FMLA rights: (1) during the October 25, 2019 meeting about the fire incident; (2) on November 27, 2019 when he asked Curtis for a day off; and (3) on February 12, 2020 when he asked Curtis for another day off.  Doc. No. 64 at PageID 2024–25.  Each involved Smyer driving his stepdaughter to school or a medical procedure.  *Id.*  Smyer maintains that on all three occasions he told his supervisors he was using his approved FMLA leave.  *Id.*

Begin with the October 25, 2019 meeting.  Kroger contends that Smyer never mentioned he was using FMLA leave to pick up his stepdaughter.  Doc. No. 57 at PageID 1620.  Look at the meeting notes, Kroger says.  They contain no reference to FMLA leave.  *Id.*  Instead, Kroger points out, Hatfield asks Smyer whether his daughter could have arranged for alternative transportation like Uber or Lyft.  Doc. No. 15-1 at PageID 700.  Smyer acknowledged the point, responding, "I see what you're saying," but did not explain that his stepdaughter's medical condition prevents her from driving or that he had approval to take FMLA leave.  *Id.*

Even Smyer is not exactly clear on whether he brought up FMLA leave.  At different points in his brief, Smyer claims that he both told Hatfield he was exercising his approved FMLA leave and that Hatfield never let him explain himself.  *Compare* Doc. No. 64 at PageID 2024–25 ("although Mr. Curtis did not give Mr. Smyer an opportunity to explain that he was using his intermittent FMLA [sic] to pick up his daughter because she cannot drive, during the October 26[sic], 2019 meeting[sic] Mr. Smyer told Mr. Hatfield that he was using his FMLA leave[] to care for his daughter"), *with id.* at PageID 2026–27 ("during the October 26[sic], 2019 meeting Mr. Smyer told Mr. Hatfield that he used his approved FMLA intermittent leave to pick up his

daughter"). Inconsistencies aside, Smyer's claim rests only on his own say-so. No evidence in the record—other than his self-serving deposition testimony—supports his allegation that he told Hatfield, Curtis, and/or Utterback that he was using his FMLA leave. No meeting participant—other than Smyer—recalled whether he mentioned that he was approved to take FMLA leave for that purpose. Doc. No. 14 at PageID 389, 425. Nor did Smyer explain that his stepdaughter's medical condition prevented her from driving.

Smyer attempts to address this evidentiary deficiency through an affidavit from Clint Rose, his former supervisor and Curtis's predecessor. Doc. No. 64-2 at PageID 2046. Rose claims he was aware that Smyer "had approved intermittent FMLA leave" to care for his stepdaughter. *Id.* But, at most, this proves Kroger had institutional knowledge of Smyer's FMLA status. *See Slusher v. U.S. Postal Serv.*, 731 F. App'x 478, 480 (6th Cir. 2018) ("Although [the plaintiff] notes that USPS had institutional knowledge of his FMLA status, [the plaintiff] had to prove that the decisionmakers involved in the determination to temporarily transfer him to the Cincinnati plant had knowledge of his FMLA status" (first citing *Mulhall*, 287 F.3d at 551–52; and then citing *Scott*, 275 F. App'x at 482))). Smyer offers no evidence to show that Rose, or anyone else at Kroger, conveyed their knowledge about Smyer's FMLA status to Curtis, Hatfield, or Utterback before Smyer's termination. *Contra, e.g.*, *Madden v. Chattanooga City Wide Servs. Dept.*, 549 F.3d 666, 678 (6th Cir. 2008) (observing that discriminatory animus could be inferred from supervisor to decisionmaker through "discriminatory information flow"); *Beeler v. Norton Healthcare, Inc.*, No. 3:17-cv-573, 2020 WL 1265419, at *10 (W.D. Ky. Mar. 16, 2020) (finding a genuine dispute of material fact where supervisor with knowledge of the plaintiff's protected activity frequently spoke to decisionmaker about disciplinary action taken against the plaintiff). Rose's affidavit does not show—even affording Smyer all favorable inferences—that Hatfield,

Curtis, and/or Utterback should have known Smyer was exercising FMLA leave during the fire incident. *See, e.g.*, *Wells v. New Cherokee Corp.*, 58 F.3d 233, 238 (6th Cir. 1995) ("[C]ourts must consider as probative evidence any statements made by those individuals who are in fact meaningfully involved in the decision to terminate an employee"). No reasonable jury could conclude otherwise.

Smyer similarly fails to support his allegation that Curtis was aware he took, and requested, FMLA leave on two days in November 2019 and February 2020. Doc. No. 64 at PageID 2024, 2027. In one instance, Smyer claims that, after Curtis questioned in an e-mail why Smyer took a personal day, Smyer replied that he did so to care for his stepdaughter. Doc. No. 15 at PageID 613. Smyer never produced the e-mail nor attached it to his opposition papers. Doc. No. 64. Nor did he bother to ask Curtis about the interaction during Curtis's depositions. Doc. Nos. 61, 63.

Smyer also contends that he asked Curtis for a day off in February 2020 to drive his stepdaughter to a procedure. Doc. No. 15 at PageID 613. Smyer says Utterback was present for the conversation, too. *Id.* But, again, Smyer never asked them during their depositions whether they recalled the conversation. Doc. Nos. 61, 62, 63. Nor does Smyer submit any evidence—such as medical records, FMLA leave request forms, other documents, or testimony from other present witnesses—that would allow a jury to infer that he asked Curtis to take FMLA leave. *See, e.g.*, *Proffitt v. Metro Gov't of Nashville & Davidson Cnty., Tenn.*, 150 F. App'x 439, 443 (6th Cir. 2005) ("Where the decisionmaker denies having knowledge of the alleged protected activity, the plaintiff must do more than 'offer[ ] only conspiratorial theories . . . or flights of fancy, speculations, hunches, intuitions, or rumors'" (quoting *Mulhall*, 287 F.3d at 552) (internal quotation marks omitted)).

It was Smyer's burden to put forward direct or circumstantial evidence tending to show that those responsible for his termination were aware that he took, or intended to take, FMLA leave. *See, e.g.*, *Donald*, 667 F.3d at 761. He did not do so. *See Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) ("[T]he party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary" (emphasis omitted)). The upshot is Smyer cannot demonstrate either a *prima facie* case of FMLA interference or retaliation, and Kroger is entitled to judgment as a matter of law on his Counts 1 and 2. *See, e.g.*, *Mulhall*, 287 F.3d at 552 (concluding summary judgment was appropriate when the plaintiff supported the *prima facie* case with only "conspiratorial theories, not the specific facts required under the Federal Rule of Civil Procedure 56").

## B. Legitimate Non-Discriminatory (and Non-Retaliatory) Reason and Pretext

Even if Smyer could show his supervisors were aware that he exercised his approved FMLA leave, he cannot rebut Kroger's legitimate, non-discriminatory reason for terminating him. Assuming Smyer satisfied his *prima facie* FMLA interference or retaliation case, the burden of production would then shift to Kroger to "offer a legitimate, non-discriminatory [or non-retaliatory] reason for the adverse employment action at issue." *Leadbetter v. Gilley*, 385 F.3d 683, 690 (6th Cir. 2004) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Because the burden of persuasion remains with the plaintiff, Smyer must show that Kroger's proffered rationale was a pretext for a prohibited discriminatory or retaliatory act. *See Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014). "[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Redlin v. Grosse Point Pub. Sch. Sys.*, 921 F.3d 599, 612 (6th

18

Cir. 2019) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). "To survive summary judgment, a plaintiff 'must produce sufficient evidence from which a jury could reasonably reject [the defendant's] explanation of why it' took an adverse employment action against the plaintiff." *Id.* "At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If so, h[is] *prima facie* case is sufficient to support an inference of discrimination at trial." *Id.* (quoting *Chen*, 580 F.3d at 400 n.4).

Kroger has met its burden to supply a legitimate, non-discriminatory and non-retaliatory reason for terminating Smyer. Doc. No. 57 at PageID 1619; *see also* Doc. No. 15-1 at PageID 721–23, 728–31. Kroger contends it fired Smyer after years of performance issues, poor leadership, and insubordination. Doc. No. 13 at PageID 256–57; Doc. No. 15-1 at PageID 721–23, 728–31, 762–70. This justification "if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)) (emphasis omitted).

Smyer advances a single reason why Kroger's legitimate explanation is not true, *i.e.*, pretextual. Doc. No. 64 at PageID 2026. In Smyer's view, Curtis "targeted" him for termination after the fire incident because Curtis never asked follow-up questions about his stepdaughter. *Id.* Curtis's omission, Smyer insists, demonstrates pretext. *Id.*

But the fire incident was just one of many performance issues that precipitated Smyer's firing. Take Smyer's struggles at the Limestone store. Doc. No. 15-1 at PageID 721–23, 728–31, 762–70. After he was moved from Bechtle Avenue, Smyer was given a third chance to demonstrate his managerial ability. *Id.* at 699–704. The Limestone store was smaller than Bechtle

Avenue, and presumably easier to supervise. *Id.* Hatfield felt it would give Smyer an opportunity to redeem himself. *Id.* When Kroger made the decision to close the Limestone store, Curtis and Utterback assigned Smyer a set of benchmarks to close the store. Doc. No. 15 at PageID 597; Doc. No. 15-1 at PageID 722–23. Several of Smyer's supervisors concluded he came up short.

Curtis found that Smyer had made little progress on his shutdown tasks weeks after they were assigned. Doc. No. 15-1 at PageID 730. Curtis gave Smyer specific assignments like rearranging product in a frozen food aisle, conditioning a promotional display, and cleaning the liquor section shelves. *Id.* Smyer not only failed to complete these requests, but he neglected to instruct his assistant managers on their responsibilities. *Id.*

Utterback was similarly frustrated. *See id.* at PageID 728. She followed up with Smyer several times about his failure to complete staff schedules or complete subordinate performance reviews. *Id.* Smyer ignored her messages for weeks a time. *Id.* at PageID 728–29.

When Curtis and Utterback emailed Hatfield on March 4, 2020, with their concerns about Smyer, it was not the fire incident they complained about. *Id.* at PageID 727–31. Instead, they attached their notes on Smyer dating back to February 15, 2020. *Id.* Their comments were limited to his Limestone store performance and do not mention what occurred at Bechtle Avenue. *Id.* Hatfield "[d]etermined [the] situation was sufficient to terminate" after talking with Curtis and Utterback about their struggles with Smyer at the Limestone store. *Id.* at PageID 732.

In his complaint, Smyer alleges that, after the fire incident, Curtis resolved to "paper" his personnel file with sham performance complaints to convince Hatfield to fire him. Doc. No. 1 at PageID 95, 97. He seems to suggest that Curtis and Utterback had their mind made up about his termination during the October 25, 2019 meeting and that all of their negative feedback about his Limestone store performance is irrelevant. Doc. No. 64 at PageID 2026–27. On Smyer's theory,

Hatfield, Curtis, and Utterback fired him because they thought he mishandled the fire incident and all the disciplinary action that followed was window dressing. *Id.*

Smyer's theory is unsupported by the record. Smyer would have had to explain away as illegitimate the discipline administered during his Limestone store tenure. He tried that when he received it to no avail. Doc. No. 15-1 at PageID 725. When Curtis issued him the February 2020 disciplinary memorandum for his inadequate shutdown task progress, Smyer cited Hargis's approval of his work as a defense. *Id.* But Hargis refuted Smyer's characterization of his feedback. *Id.* Beyond this debunked reason, Smyer identifies no evidence in the record to show that Kroger's proffered rationale for his termination was false. *See, e.g.*, *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) ("At this stage, the plaintiff has the burden to produce 'sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired her'" (quoting *Chen*, 580 F.3d at 400)). He has not demonstrated pretext.

To recap, Smyer's *prima facie* case is deficient because no evidence in the record suggests that Hatfield, Curtis, and/or Utterback knew, or should have known, he exercised FMLA leave. Even affording him the favorable inference that they were on notice, Smyer points to no evidence—beyond his conjecture and suspicions—to throw Kroger's non-discriminatory, non-retaliatory reason into doubt or show it was pretextual. *See, e.g.*, *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 81 (6th Cir. 2020) (explaining that when documented performance issues are cited

as the employer's proffered reason, a plaintiff must show they "never occurred or were factually false").[2]  Accordingly, Kroger is entitled to summary judgment on Smyer's Counts 1 and 2.[3]

**V.**

Smyer next contends he is entitled to summary judgment on his reverse race discrimination claim (Count 9).  Doc. No. 58 at PageID 1694.[4]  Kroger moves for summary judgment on Smyer's reverse sex discrimination charge (Count 8) and his aiding and abetting race and sex discrimination claim (Count 10).  Doc. No. 57 at PageID 1620.  The Court will review these claims together.

**A.     Reverse Race Discrimination**

Reverse race discrimination claims based on indirect evidence are evaluated under the *McDonnell-Douglas* burden-shifting framework.  *Newman v. Federal Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001).  To demonstrate a *prima facie* case of reverse discrimination, a plaintiff must show that he or she (1) "is a member of a protected class"; (2) "was qualified for the job"; (3) "suffered an adverse employment decision"; and (4) "was replaced by a person outside the

---

[2] Were Smyer to advance his case past the pretext stage, he believes the "cat's paw" liability theory should apply.  "Cat's paw" "refers to 'one used by another to accomplish his purposes.'  In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action.'"  *Marshall v. Rawlings Co.*, 854 F.3d 368, 377, 380–81 (6th Cir. 2017) (quoting *EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 484 (10th Cir. 2006)).  Smyer believes Curtis and Utterback duped the unsuspecting Hatfield into firing him because they were upset he exercised his FMLA rights.  Doc. No. 64 at PageID 2027–28.  The Court need not indulge this theory, for it is premised on the unsupported allegation that Curtis and Utterback knew Smyer took FMLA leave.

[3] Smyer's Count 12 claims that Kroger breached an implied employment contract when it allegedly violated his FMLA rights.  Doc. No. 1 at PageID 112.  Because Smyer's FMLA claims fail as a matter of law, Kroger is also entitled to summary judgment on Smyer's Count 12.

[4] Smyer does not identify the particular authority he brings his reverse race discrimination claim under.  Doc. No. 1 at PageID 109.  In his summary judgment motion, he invokes Title VII's prohibition of adverse employment actions taken "because of such individual's race."  Doc. No. 58 at PageID 1700 (quoting 42 U.S.C. § 2000e-2(a)).  The Court will therefore assume for purposes of this summary judgment analysis that Smyer intended to sue under federal law.  This requires the Court to overlook the fact that Smyer failed to exhaust his administrative remedies with the Equal Employment Opportunity Commission or the Ohio Civil Rights Commission before filing his complaint.  *See Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010).  Because, as explained below, Smyer's reverse race discrimination claim fails as a matter of law, it is unnecessary to consider administrative exhaustion as an alternate bar.

protected class or treated differently than similarly situated non-protected employees." *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008). "The Sixth Circuit has adapted this four-prong test to cases of reverse discrimination, where a member of the majority is claiming discrimination." *Leadbetter*, 385 F.3d at 690 (quoting *Sutherland v. Mich. Dep't of Treas.*, 344 F.3d 603, 614–15 (6th Cir. 2003)). In such cases, a plaintiff satisfies the first prong of the *prima facie* case by "demonstrating 'background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" *Id.* "To satisfy the fourth prong in a reverse-discrimination case, the plaintiff must show that the defendant treated differently employees who were similarly situated but were not members of the protected class." *Id.* (cleaned up).

Smyer fails to demonstrate he was treated less favorably than similarly situated minority employees. To establish the similarly situated requirement in a reverse discrimination case, a plaintiff must identify minority employees "similar" to him in "all relevant respects." *Strickland v. City of Detroit*, 995 F.3d 495, 515 (6th Cir. 2021) (quoting *Miles v. S. Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 893 (6th Cir. 2020)). "Exact correlation" between the plaintiff and comparators is not necessary. *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 752 (6th Cir. 2012), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013). But, in a disciplinary context, like here, the plaintiff must show that he and the proposed comparator have engaged in acts of "comparable seriousness." *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002) (quotation omitted) (emphasis omitted).

Smyer alleges that, between 2019–2021, six African American Kroger store managers were offered severance packages more comprehensive than the two-month severance offer he received upon his termination. Doc. No. 58 at PageID 1702. Smyer claims that three African American

managers who were terminated for cause yet, nonetheless, were extended severance packages comparable to the three managers who left Kroger during a reorganization.  *Id.*  He insists that Hatfield should have offered him a similar severance package that the six African American managers received.  *Id.*

Smyer's similarly situated allegations are unsupported by the record.[5]  First, the six African American managers received severance packages under Kroger's Reorganization Severance Plan. Doc. No. 58-1 at PageID 1712.  This package was offered to employees who were "involuntarily separated [from Kroger] due to the reorganization of the Company, its business units or operations."  *Id.*  Hatfield testified that the eligibility criteria for a reorganization severance package is "different" than the severance package offered for a termination for cause.  Doc. No. 13 at PageID 274.  By its own terms, the reorganization severance plan was unavailable to employees "discharged for cause."  Doc. No. 58-1 at PageID 1716.  Smyer was terminated for cause and therefore was never eligible for the reorganization severance package.  Doc. No. 13 at PageID 253.

Smyer likewise provides no factual support for his claim that three of the six African American managers were fired for cause.  Doc. No. 58 at PageID 1702.  Indeed, in his affidavit offered in support of his summary judgment motion, he asserts that the three managers were "allegedly [terminated] for cause," but does not attach corroborating documentation or testimony

---

[5] Moreover, Smyer does not explain how Kroger's alleged post-termination conduct demonstrates he was fired because of his race.  Doc. No. 58.  A discrimination claim necessarily requires proof that the discriminatory intent was formed prior to the adverse employment action.  *See, e.g.*, *Tibbs v. Cavalry United Methodist Church*, 505 F. App'x 508, 515 (6th Cir. 2012) (memoranda written after the termination were not relevant to show discriminatory intent).  Smyer advances no evidence to show that his race factored into his termination, and he cannot backfill that gap with post-termination allegations.  Doc. No. 58.  To be sure, post-termination comments can be used to bolster a race discrimination claim, *see, e.g.*, *Hilden v. Hurley Med. Ctr.*, 504 F. App'x 408, 415 (6th Cir. 2012), or to show punitive damages, *see, e.g.*, *West v. Tyson Foods, Inc.*, 374 F. App'x 624, 636 (6th Cir. 2010).  But post-termination actions, as Smyer claims here, cannot be the standalone basis for a race discrimination claim.

explaining what allegedly prompted their termination. Doc. No. 58-1 at PageID 1710. It is thus undisputed that the three African American managers Smyer compares himself to were not terminated for cause. Doc. No. 66-1 at PageID 2057. If they were, they would not have been eligible for the reorganization severance package. Doc. No. 58-1 at PageID 1716.

Smyer has not met his burden to show sufficient similarities between he and his proffered comparators. *See, e.g.*, *Treadwell v. Am. Airlines, Inc.*, 447 F. App'x 676, 679 (6th Cir. 2011) ("Showing that similarly situated employees of other races were treated differently than the plaintiff is an independent evidentiary requirement" in a reverse race discrimination claim). He has thus failed to demonstrate a *prima facie* case of reverse race discrimination. Kroger is entitled to summary judgment on Smyer's Count 9 and his Count 10 related to aiding and abetting reverse race discrimination.

### B.    Reverse Sex Discrimination

Smyer faces a similar burden to state a *prima facie* case of reverse sex discrimination. He must demonstrate Kroger is "the unusual employer who discriminates against men, that he was qualified for his [] position, that [Kroger] took an adverse action against him, and that he was treated differently from similarly situated women." *Becker v. Elmwood Loc. Sch. Dist.*, 519 F. App'x 339, 342 (6th Cir. 2013). "To satisfy the fourth prong in such cases, the plaintiff must show that the defendant treated differently employees who were similarly situated but were not members of the protected class." *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 569 (6th Cir. 2009) (quoting *Sutherland*, 344 F.3d at 614).

Smyer again fails to put forward sufficient comparator evidence. He alleges that, around the time he was terminated, Kroger offered store manager positions to six female assistant store managers, all of whom he was more qualified than. Doc. No. 1 at PageID 110. Smyer, however, offers no evidence to show that he and the six assistant store managers had similar disciplinary

histories. *Id.*; Doc. No. 64 at PageID 2037. Smyer's assertion is bare bones: he provides no information about the alleged comparators' qualifications for the store manager positions, let alone their names. Doc. No. 64 at PageID 2037. Without any evidence, other than his self-serving allegations, to suggest that his sex was a determinative factor in his termination, Smyer cannot state a *prima facie* case of reverse sex discrimination. *See, e.g.*, *Simpson*, 359 F. App'x at 569 (affirming the district court's conclusion that the plaintiff failed to state a *prima facie* case of reverse sex discrimination without evidence the plaintiff and comparators "engaged in acts of 'comparable seriousness'" (quoting *Clayton*, 281 F.3d at 611–12)). Kroger is entitled to summary judgment on Smyer's Count 8 and his Count 10 related to aiding and abetting reverse sex discrimination.

## VI.

Smyer next alleges he was fired because of a perceived disability in violation of Ohio Rev. Code § 4112.02(A) (Count 7). Doc. No. 1 at PageID 107. Because Ohio's anti-discrimination law and the Americans with Disabilities Act ("ADA") are similar, the Sixth Circuit "consider[s] the ADA and state law claims simultaneously by looking to the cases and regulations that interpret the ADA." *Kreszowski v. FCA US, LLC*, No. 21-3730, 2022 WL 782664, at *6 (6th Cir. Mar. 15, 2022) (quoting *Talley v. Fam. Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1104 n.3 (6th Cir. 2008)). Smyer elects to show to disability discrimination through indirect evidence. Doc. No. 64 at PageID 2034; *see Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th Cir. 1999).

"To prove a *prima facie* case of disability discrimination, a plaintiff must show that (1) he is disabled, (2) he is otherwise qualified to perform the essential functions of a position, with or without accommodation, and (3) he suffered an adverse employment action because of his disability." *Demyanovich*, 747 F.3d at 433 (citing *Talley*, 542 F.3d at 1105). "[T]o state the threshold condition of a 'regarded as' ADA claim, an employee need only show that their employer

26

believed they had a 'physical or mental impairment.'" *Babb v. Maryville Anesthesiologists, P.C.*, 942 F.3d 308, 319 (6th Cir. 2019).  "The employer may then rebut this showing by pointing to objective evidence 'that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment) both transitory and minor.'"  *Id.* (quoting 29 C.F.R. § 1630.15(f)) (citations omitted).

Smyer alleges that Hatfield fired him because he believed Smyer had a disability.  Doc. No. 64 at PageID 2034–35.  During the March 6, 2020 meeting, Smyer asked Hatfield for a referral to a Kroger-sponsored counselor.  Doc. No. 15-1 at PageID 769–70.  Smyer explained to Hatfield that he was dealing with emotional distress from his confrontation with Curtis.  Doc. No. 15 at PageID 616.  When Hatfield contacted Smyer to reschedule their adjourned meeting, Smyer mentioned that he had an appointment with a counselor on March 10, 2020.  Doc. No. 13 at PageID 260.  Hatfield scheduled the termination meeting for March 11, 2020.  *Id.*  Smyer contends that Hatfield decided to fire him after learning he sought mental health treatment.  Doc. No. 64 at PageID 2034–35.

But Smyer's account is contradicted by the undisputed record.  Hatfield made the termination decision earlier, on March 4, 2020, after speaking with Curtis and Utterback.  Doc. No. 13 at PageID 252–53.  That is why Hatfield gave Curtis and Utterback the go-ahead to meet with Smyer and offer him a chance to voluntarily resign.  *Id.* at PageID 256; Doc. No. 15-1 at PageID 732.  Hatfield testified that nothing Smyer could have said in the March 6 and 11 meetings would have changed his mind.  Doc. No. 13 at PageID 257.

Smyer's sole proof that Hatfield fired him because of a perceived disability is the timing of the termination meeting.  Doc. No. 64 at PageID 2034–35.  Smyer claims that the only thing that changed between March 6 and 11 was his counseling request.  *Id.*  Because Hatfield did not

fire him on March 6, Smyer contends that his perceived disability prompted his termination on March 11. *Id.* But this ignores that Hatfield had already made the termination decision before he formed his purported perception about, or discovered, Smyer's alleged disability. Doc. No. 13 at PageID 152–52. This later-in-time belief could not have produced the earlier-made termination decision. *See, e.g.*, *Arthur v. Am. Showa, Inc.*, 625 F. App'x 704, 708 (6th Cir. 2015) (concluding that an employer could not fire the plaintiff because of his disability without knowing he had a disability).

Even if Hatfield believed Smyer was suffering from a mental impairment when he made the termination decision, Smyer still must show that Hatfield believed Smyer's emotional distress "substantially limit[ed] one or more major life activities." *Johnson v. Univ. Hosp. Physicians Servs.*, 617 F. App'x 487, 491 (6th Cir. 2015) (quoting *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 521–22 (1999)). At most, Smyer can prove that Hatfield was aware Smyer sought counseling the day before his termination. Doc. No. 13 at PageID 260. But he offers no evidence to show that Hatfield believed that, because of his counseling request, Smyer was now unable to carry out store manager responsibilities. *See, e.g.*, *Bailey v. Real Time Staffing Servs., Inc.*, 543 F. App'x 520, 523 (6th Cir. 2013) ("Even under the relaxed standard of the 2008 amendment, we have some doubt that a plaintiff who merely informs his employer of an unspecified 'medical condition' can prove that he has a perceived 'impairment' and is thus 'disabled'"). Therefore, no reasonable jury could find that Hatfield fired Smyer because he believed, or perceived, Smyer was disabled. Kroger is entitled to summary judgment on Smyer's Count 7 and his Count 10 related to aiding and abetting disability discrimination.[6]

---

[6] Smyer's Count 11 is a claim for wrongful discharge in violation of federal and state public policy against discrimination. Doc. No. 1 at PageID 112. Having found that Smyer's FMLA and race, sex, and disability discrimination claims all fail as a matter of law, Kroger is also entitled to summary judgment on Smyer's Count 11.

## VII.

Smyer's remaining claims (Counts 3-6 and 13) involve a host of common law tort and contract causes of action. Doc. No. 1. He alleges that Curtis assaulted him during the March 4, 2020 meeting and that Curtis, Hatfield, Hargis, and Utterback are all liable for intentional infliction of emotional distress for their role in his termination. Doc. No. 1 at PageID 103–06. Smyer also claims that both Curtis and Kroger committed fraud and wrongfully discharged him. *Id.* at PageID 106–07, 113–14.

These claims have something in common: they are before the Court thanks to its supplemental jurisdiction. 28 U.S.C. § 1367. Congress provided that district courts "shall have supplemental jurisdiction over all other claims that are so related to claims" within their original jurisdiction "that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Exercising supplemental jurisdiction is discretionary. *See Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010). Section 1367(c)(3) authorizes district courts to decline supplemental jurisdiction "if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

"When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well"). "Once a federal court no longer has federal claims to resolve, it 'should not ordinarily reach the plaintiff's state-law claims.'" *Southard v. Newcomb Oil Co.*, 7 F.4th 451, 455 (6th Cir. 2021) (quoting *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006)); *see also Royal Truck & Trailer Sales & Serv., Inc. v. Kraft*, 974 F.3d 756, 763 (6th Cir. 2020) (upholding a district court's decision to decline supplemental jurisdiction over state law claims

under "the settled rule that [dismissal is appropriate] when a district court dismisses all claims over which it has original jurisdiction").  "District courts should retain supplemental jurisdiction 'only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues.'"  *Oberer Land Developers Ltd. v. Sugarcreek Twp.*, No. 21-3834, 2022 WL 1773722, at *6 (6th Cir. June 1, 2022) (quoting *Packard v. Farmers Ins. Co. of Columbus Inc.*, 423 F. App'x 580, 584 (6th Cir. 2011)).

Comity and efficiency do not support retaining jurisdiction over Plaintiff's remaining state law claims.  Advancing these claims further would require the Court to "resolve exclusively" state law issues.  *Southard*, 7 F.4th at 455.  Therefore, the Court will decline to exercise supplemental jurisdiction over Plaintiffs' Counts 3-6 and 13 and dismiss them without prejudice.

## VIII.

For the foregoing reasons, the Court: (1) **GRANTS** Kroger's summary judgment motion (Doc. No. 57); (2) **DENIES** Smyer's motion for leave to file a revised memorandum in opposition (Doc. No. 70); (3) **DENIES** Smyer's cross summary judgment motion (Doc. No. 58); (4) **DISMISSES WITH PREJUDICE** Smyer's Counts 1-2 and 7-12; (5) **DISMISSES WITHOUT PREJUDICE** Smyer's Counts 3-6 and 13; and (6) **TERMINATES** this case on the docket.

**IT IS SO ORDERED.**

Date:   July 14, 2022                                    s/Michael J. Newman
                                                        Hon. Michael J. Newman
                                                        United States District Judge